## HENRY T. BACKUS *vs.* HENRY BYRON.

An agreement made between attorney and client, that the former should prosecute an ejectment suit for an interest which the latter claimed in property—the client to advance the expenses of the suit, and the attorney, in case of failure, to have nothing for his services ; but, on recovery, a part of the property, or its value in money—is void for champerty.

On case made after judgment.    Wayne Circuit Court.

Henry T. Backus *vs.* Henry Byron.

The plaintiff brought this action to recover for his services as an attorney and counsellor at law, rendered in a suit brought by the defendant, under a special agreement. The defendant claiming to be the owner in fee of five-sevenths of a certain lot in Detroit, at the time held adversely, employed the plaintiff to prosecute a suit in ejectment, to recover the interest he claimed in the premises. The suit was brought, and prosecuted to a successful termination. The agreement between the plaintiff and defendant as to plaintiff's compensation for his services in the suit, was as follows : The defendant was to advance the necessary expenses to carry on the suit, and in the event of a failure to recover, the plaintiff to have nothing for his services, but in the event of a recovery, to have an undivided seventh of the property, or the value of that seventh in money.

*D. Harbaugh,* for plaintiff, as to definition of champerty, cited 4 Black. Com., 134. As to the point that where one part of an alternative promise is void and another part valid, it will be upheld for the valid part. (*Pars. on Cont.,* 380; *Money* vs. *Leake,* 8 *T. R.,* 411; *Kemson* vs. *Cole,* 8 *East.,* 236; *Norton* vs. *Simmes, Hob.,* 14; *Leavitt* vs. *Palmer,* 3 *Comst.,* 37; 6 *E. F. Moore,* 152; *Evans* vs. *Bell,* 6 *Dana,* 479; *White* vs. *Roberts,* 4 *Dana,* 172; *Ramscy* vs. *Trent,* 10 *B. Mon.,* 336; *Bayard* vs. *McLean,* 3 *Harr.* [*Del.*], 139.)

*Walkers & Russell,* for defendant, that champerty is an offence at common law, cited 1 Russ. on Crimes ; 1 Greenl. Ev., § 104; Pars. on Cont., 262; 4 Kent Com., 489; Greenl. Ev., § 180; Wallis *vs.* Duke of Portland, 3 Ves., 501; Pechelli *vs.* Watson, 8 M. & W., 691; Sweet *vs.* Parr, 11 Mass., 549; Thurston *vs.* Percival, 1 Pick., 406; Key *vs.* Vatten, 1 Ham., 132; Barnes *vs.* Story, 1 Jones Eq., 100; Elliott *vs.* McClelland, 17 Als., 206; Brown *vs.* Beauchamp, 5 T. B. Mon., 413.

Henry T. Backus *vs.* Henry Byron.

That champerty is still a part of the law of the land in this country and in England : 4 Bl. Com., 134; Chit. on Cont., 675; Russ. on C., 175; 2 Spenc. Eq., 870;. 1 Atk., 224; 3 Ves., 501; 15 Ib., 156; 18 Ib., 126; 2 B. & B., 524; 5 B. & C., 188; 7 Bing., 369; 2 M. & K., 590; 8 M. & W., 691; 4 How., 430; 4 Bligh, 1; 11 Mass., 549; 9 Met., 489; 5 J. Ch., 44; 20 J. R., 386; 5 Paige, 311; 8 B. Mon., 488; 9 Ala., 755; 13 Ohio, 175; 1 Greenl., 192.

By the Court, GREEN, J.

On the trial of this cause before the Court without a jury, it was insisted on the part of the defendant, that this agreement was void on the ground of champerty, and that the plaintiff was not entitled to recover thereon. The Court held that the argreement was not void, and rendered a judgment in favor of the plaintiff and against the defendant, for damages and costs, whereupon the defendant excepted to the ruling of the Court.

The case shows that there was some apparently conflicting testimony upon the trial, in regard to the terms of the contract in question, and it is assumed on the part of the plaintiff, that the weight of the testimony shows an agreement essentially different from that found by the Court ; an agreement wherein the property sought to be recovered was referred to merely as a measure of the compensation for the plaintiff's services, and not as forming the compensation itself. Without expressing any opinion whether, in a case made after judgment for the purpose of review, this Court will undertake to weigh conflicting testimony, it is sufficient to remark here, that the finding of this Court was in accordance with the testimony of the only witness who pretended to have heard the agreement made between the parties, and also that we must presume (the pleadings not being before us) that it was in accordance with the special contract or agreement under which the plaintiff sought to recover.

68

The grave question is then presented to this Court, for the first time during its existence, whether such an agreement between an attorney and his client can be upheld and enforced by the law of the land, or whether it is void on the ground of champerty.

That champerty was regarded as *malum in se*, and an offence of a high grade at the common law, which rendered void all contracts tainted with it, cannot be questioned. Barratry and maintenance (of which latter champerty was regarded as the most odious species) were offences of a kindred character, tending to strife, oppression and injustice, and the perpetrators thereof were visited with grievous punishments. (*Hawkins P. C., Ch.* 84; *Coke's Inst.*, 368, *b;* 4 *Bl. Com.*, 134; 2 *Chitty's C. L.*, 234, *note a ;* 4 *K. Com.*, 6 *ed.*, 449, *note a.*)   Our attention will first be directed to the inquiry, what constitutes champerty at the common law. Hawkins defines it to be : " The unlawful maintenance of a suit in consideration of an agreement to have part of the thing in dispute, or some profit out of it." (*Hawkins P. C., ch.* 84, § 1.)   Lord Coke says, it is " to maintain to have part of the land, or part of the debt, or other thing in plea or suit." (*Co. Lit.*, 368, *b.*)   Chitty defines it to be " a bargain to divide the land (*campum partire*) or other subject in dispute, on condition of his carrying it on at his own expense ;" and this is the definition given by Sir Wm. Blackstone. (2 *Chitty's Cr. L.*, 234, *note a ;* 4 *Pol. Com.*, 135.)   Sir Wm. Grant, in 15 Vesey, 139, says : Champerty " is the unlawful maintenance of a suit in consideration of a bargain for a part of the thing, or some profit out of it ;" and this definition is quoted by Tindall, Ch. J., in Stanley *vs.* Jones (7 *Bing.*, 369.)

Mr. Bouvier, in his Institutes of American Law, vol. 4, p. 236, says : " By champerty is meant a bargain with a plaintiff or defendant, *campum partire*, to divide the land or other thing sued for between them if they prevail at law, the champertor agreeing to carry on the suit at his own expense.

It differs from maintenance in this, that in the latter the person assisting the suitor receives no part of the benefit, while in the former he receives one half, or other proportion of the thing sued for ;" and Mr. Taylor, in his Law Glossary, defines it to be the purchasing of a right, or pretended right, under a condition that part, when obtained by suit, shall belong to the purchaser.

Although there is considerable diversity in the language used by these and other authors in describing this offence, yet I think, that upon examination it will appear that they all agree in substance. When it is considered that champerty is a species of maintenance, it is clear that all these definitions import, that the party bargaining for an interest in the thing in dispute, undertakes to *aid* in the prosecution of the suit for its recovery, and whether such aid is furnished in money by a layman, who pays the expenses of the suit, or by an attorney, or solicitor, in services rendered in its prosecution, it is the same, and each alike in effect, and in contemplation of law, is a maintainer of the suit, and prosecutes it, in whole or in part, at his own expense. The consideration paid in the latter case would be equally as valuable as in the former, and the inducement to prosecute a doubtful or unconscionable claim would be the same, and the evil, if any, the same. It is equally champerty whether the contract be for one half, one quarter, or one eighth of the thing in dispute ; and it would be strange indeed if the validity or invalidity of a contract of this character were made to depend upon the *amount* of the consideration to be paid, or in other words, upon the payment of a *part* or the *whole* of the expenses of the suit. If the act were only *malum prohibitum*, the statute defining the offence and declaring its consequences, would require a strict construction according to a familiar rule, that when an act constitutes an offence at the common law, verbal criticisms upon the language used by authors in defining it,

not based upon some substantial ground of reason, are entitled to but little notice.

That venerable code of rules of human conduct, which has been eulogized by its sages as the perfection of human reason, would no longer be entitled to the respect of learned jurists for its wisdom, if its mandates could be so easily evaded, and its ends be thus defeated. If payment by the suitor of some small portion of the expenses of the prosecution would render the contract lawful, all the evils which have been supposed to result from maintenance and champerty would flow unrestrained, while their perpetrators would be held justified, and receive the benefits of their pernicious acts uncensured; for no attorney, when contracting for part of the thing in dispute, would ever fail thus to provide for the promotion of his interests, when impunity could be purchased at so cheap a rate. However, it may sometimes happen with statutes which are framed and enacted amidst the hurry and confusion of modern legislation in this country, the common law is not so lame and impotent in its provisions, and there is no reported case in England or this country wherein such a doctrine has been held.

Champerty, as. thus defined, being an offence at the common law, is it recognized as such by the laws of this State ? Section 22, of Chapter 161, of the Revised Statutes ( *p.* 189), provides, that " every person who shall commit any indictable offence at the common law, for the punishment of which no provision is expressly made by any statute of this State, shall be punished by imprisonment in the County jail not more than two years, or by fine not exceeding two thousand dollars, or both, in the discretion of the Court." This provision is very general in its terms, and fully recognizes, as in force, the rules of the common law, which ascertain and define what acts constitute offences. If champerty, therefore, is such an offence at the common law, it is unlawful in this

State, unless, as is claimed on the part of the plaintiff, the reason of it has ceased to exist, which will be considered hereafter.

For the purpose of illustrating the doctrine of champerty and maintenance, in reference to their effects upon contracts at law and in equity, the following English cases may be consulted : Wallis *vs.* Duke of Portland, 3 Ves., 494; Powell *vs.* Knoller, 2 Atk., 224; Stevens *vs.* Bagwell, 15 Ves., 139; Wood *vs.* Downs, 18 Ves., 120; Newman *vs.* Payne, 3 Ves., 203 ; Welles *vs.* Middleton, 1 Cox, 125 ; 7 Bing., 369. No question being made as to what is the law of England upon this subject, it is not·necessary to review any of these cases ; but inasmuch as it has been supposed that, under the state of society existing in the American States, it is not applicable here, it seems proper to examine a few of the leading American authorities upon this subject, in order to glean from them whatever light they may throw upon the question before us, and to see how far, and under what circumstances, it has been held to apply to contracts between attorney or solicitor, and client.

The case of Brown *vs.* Beauchamp (5 *T. B. Mon.*, 413, *decided in* 1827), was an action by an attorney to recover $100 for service in the prosecution of a suit. The contract was to pay the attorney $100, and one half the land in controversy, in case of. success, but in case of failure to recover, nothing was to be paid. After a successful termination of the suit, the plaintiff brought this action for the money, but not for the land, and the Court held that the contract was tainted with champerty, and, therefore, void.

The case of Merritt *vs.* Lambert (10 *Paige's R.*, 352), was decided by the Chancellor in 1843. Wallis, the solicitor of one of the parties, had entered into an agreement with his client, by which he was to have the rents and profits of certain lots in controversy for his services, if he succeeded in the defence of the suit. A large amount of rents had.come into his

hands, and on an application of the client for an order that he pay over such rents, this agreement was holden to be void, by the Vice Chancellor. It was appealed to the Chancellor, and, in his opinion, he lays down the doctrine that one is not permitted, " either as attorney or solicitor, or as counsel, to contract with his client, previous to the termination of the suit, for a part of the demand or subject of litigation, as a compensation for his services ;" and he cites, in support of this position : 1 Pick. R., 415; 2 Mart. (Louis.) R., 281; 1 Ham. O. R., 132; 3 Littell R., 411; 6 Mon. R., 389; 5 Paige, 311. The case was removed to the Court for the Correction of Errors, where the order of the Chancellor was unanimously affirmed. (2 *Denio R.*, 607.)

In Thompson *vs.* Warren (8 *B. Mon.*, 488, *decided in* 1848), a contract to prosecute a suit for one half that should be recovered, was held void for champerty.

The case of Lathrop *vs.* the Amherst Bank (9 *Metc. R.*, 489), was decided in 1845, by the Supreme Court of Massachusetts, in which a contract was held to be void for champerty, upon similar grounds. It was also held in that case, that to constitute champerty, it was not necessary that the attorney should agree to pay the expenses of the suit, when the litigation was upheld by personal services.

See also the case of Elliott *vs.* McClelland (17 *Ala. R.*, 206), decided in 1850, where the common law doctrine in regard to champerty was applied to a contract made by an attorney with his client to collect money by suit, and for his services to retain twenty per cent. of the money collected, or be paid $200, as he should elect. The plaintiff in that case contended that, if the contract was void for champerty, as to that part of it relating to the retention of the twenty per cent., yet that it was divisible, and he was entitled to recover the $200 stipulated for his services ; but the Court held that the contract was entire, and, being tainted with champerty, was wholly void.

In the the case of Wilhite *vs.* Roberts (4 *Dana R.*, 172), it was held that, where the attorney was to receive a sum equal to a certain portion of the thing recovered, in money, but was to have no interest in the thing itself, the contract was not champertous. The Court, in that case, however, say, that " champerty is the most odious piece of maintenance, and was an offence at common law, and has been denounced by various highly penal statutes, in aid of the common law. It always has been regarded as an offence against the peace of society, the administration of impartial justice, and tending to the encouragement of litigation, and the oppression of the weak. And the Courts have been uniformly vigilant, where the peace, and quietude, and justice of the country are regarded, not only in enforcing their penalties, but in declaring void all contracts made in derogation of their provisions. If the contract contained any stipulation on its face, in derogation of their provisions, we should find no difficulty in treating it as a nullity, and refusing all aid from the law or the Courts in enforcing it, or any stipulation in it, however lawful."

These cases, and those before cited, with many others, show incontestably that champerty, as defined by the common law, has been generally holden to vitiate all contracts tainted with it. (*See* 4 *Kent's Com.*, 6 *ed.*, *p.* 449, *note a.*) There is one American case, however, in which the common law doctrine of champerty and maintenance is held to be no longer in force, the evils which they were designed to remedy or punish, being supposed no longer to exist. I refer to the case of Bayard *vs.* McLane (3 *Har. R.*, 139), which was twice very ably argued by eminent counsel, and received a very elaborate examination upon all the points raised in the case, by Harrington. J.

The case presented was that of an attorney contracting to render his services in certain suits and proceedings, in

consideration that he should receive therefor one third of the proceeds thereof, the other party paying the expenses of the proceedings. The contract had never been fulfilled on the part of the attorney, and it was determined that, for that reason, it could not be enforced in favor of his representatives, so that it did not become necessary to the decision of the case to determine whether it was void for champerty or not, but the question was made and fully argued, and received the deliberate consideration of the Court. [Some stress seems to have been laid upon the circumstance that the client, and not the attorney, was to defray the expenses of the prosecutions.

The Judge, in his opinion, says (referring to the English statutes upon the subject): "These statutes of Edward I seem to have introduced a new feature into the definition of champerty. The evils which they were designed to meet was, the conveyance of pretended titles, by those who were unable or unwilling to incur the expense of prosecuting them, to men of wealth and power, who should carry on the prosecution at their own expense, and divide the proceeds. It was a maintenance, not only by influence and power, but by the actual means of conducting the suit, and that, on a contract for a part of the thing in action, which, by the common law, was itself unlawful. Hence, says the statute, 'champertors be they that move pleas and suits, or cause to be moved, either by their own procurement, or by others, and sue them at their proper costs, for to have part of the land in variance, or part of the gains.' This important ingredient of paying, or contributing to the expenses of the suit, seems, ever since, to have been regarded as essential to constitute the offence of champerty, being introduced into all the elementary works of authority, as a part of the definition." After citing Blackstone's definition of champerty (4 *Bl. Com.*, 135), he adds: "This is an important matter, in refer-

ence to the present case. If the payment of expenses be necessary to constitute the offence, that ingredient is wanting in this case," etc.

I do not, however, understand that the decision of the question in that case was made to rest entirely upon the absence of that ingredient, and I think we have shown not only that it is not expressly introduced into all the elementary works of authority, as a part of the definition, but that, if it were, an attorney "contributes to the expenses of a suit," who renders his services therein as such, and thus relieves his client from their payment in money.

It seems to have been assumed by the Court, in the case of Bayard *vs.* McLean, that unless the undertaking on the point of attorney to prosecute the suit was *unlawful* on the ground of maintenance, the agreement to divide the thing in dispute cannot be champertous. The Judge delivering the opinion says : " The gist of the offence was maintenance—the unlawful meddling with another's suit ; which was supposed to suppress justice and truth, or at least to work delay ; the bargain to do this for a part of the thing in suit was unlawful, and an *aggravation* of the offence, because of its violation of another rule of the common law, that, *pendente lite nihil innovetur*, which I understand as meaning not merely that, pending the suit, there should be no introduction of new parties or new interests, but as embracing the substance of the old doctrine, that choses in action are not assignable," etc. It is certainly true, that the evil does not rest in the undertaking of the attorney to prosecute the suit, for that is in itself a lawful and proper undertaking, and has never been regarded otherwise ; nor can it rest in the mere undertaking to purchase a portion of the land or other thing in dispute, for since the statute of 1846 (*R. S., p.* 263, § 7), lands held adversely may be conveyed by the owner ; and choses in action are everywhere transferable. The conclusion, therefore, that a contract of this kind cannot be champertous appears very plausible, and seems to

69

have been regarded by the Court in the case under review as unanswerable. But the unsoundness of this proposition may be shown, by applying the same course of reasoning to simple maintenance at common law. It was lawful for all persons having legal rights to prosecute suits against those by whom such rights were withheld; and it was lawful also for any person having any interest in the subject of the suit, whether absolute or contingent, or standing in the relation of father, guardian, or son, etc., to aid in its prosecution, but if a stranger intermeddle to aid in its prosecution, though in a *lawful suit,* his act became *unlawful* maintenance. Upon this distinction of relationship to the party or to the suit, depended the character of the act done, and upon this it was determined whether the act was lawful or unlawful. So a person who was a habitual promoter of lawsuits was adjudged a common barrator, and it made no difference whether the litigation set on foot by him were just or unjust in its character. If the suits instigated by him were lawful suits, how, it may be asked, can he be guilty of an offence worthy of punishment, for promoting what is lawful it itself? In all these cases the offence really consists in the injurious tendency of the acts done, in view of the character or relation in which the parties stand to each other, as being calculated to promote contention and strife, and encourage useless or unnecessary litigation. This, it seems to me, constitutes the gist of the offence, and is what renders the act of maintaining unlawful. An attorney may purchase property from a stranger, or any disposable interest in property, or receive a gift; but, Lord Winslow remarks in Welles *vs.* Middleton (1 *Cox Ch. Cases,* 112): "It is perfectly well known that an attorney cannot take a gift while the client is in his hands, nor instead of his bill. And there would be no bounds to the crushing influence of the power of an attorney, who has the affairs of a man in his hands, if it were not so; but once extricate him, and it may be otherwise." It is upon the

relations of the parties, and the supposed tendency of such agreements to encourage litigation, injustice, and oppression, that the American cases, before cited, rest. So the case of Berrian *vs.* McLane (1 *Hoffman*, 421), contains a strong declaration that every agreement made, pending a litigation to pay counsel or the attorney a part of the property to be recovered, is absolutely void ; not only every contract, but the actual transfer of a part of the property in litigation is illegal, on the ground of the relation of the parties, and of the doctrine of champerty.

If such is the true ground, or one of the principal grounds of the doctrine of champerty, as it stands at the common law, it only remains for us to determine whether this reason of the law has ceased to exist.

It is said that the law against maintenance and champerty originated in a state of society, and was designed to remedy evils, which no longer exist in England or in this country ; that they had their origin in great social and political inequalities, in the feeble, partial, and corrupt administration of justice, and in the influence of powerful individuals, corrupting and overawing judicial tribunals, and making them instruments of great injustice. In the opinion of the Court for the Correction of Errors, in the case of Thallhimer *vs.* Brinkerhoff (3 *Cow. R.*, 643), it is also said, that "champerty, maintenance, and barratry, were defined as offences in very early stages of the English law. These practices seem to have been then common in England, and they were denounced, not only as sins very heinous in themselves, and highly injurious to the peace of society, but as offences which actually interrupted the course of public justice. The excitement of suits is an evil where suits are unjust, but when right is withheld, and the object of a suit is just, to promote the suit is to promote justice." When the administration of justice is firm, pure, and equal to all, and where the laws give adequate redress for groundless suits, it is not easy to conceive that

mischief can arise from opening the Courts of justice to all suitors, or from contracts by which the fruits of a suit may be divided between him who has the right of action, and him who has contributed advice, expense, or exertion, to institute the suit, or prosecute it to effect." That "if principles are considered, it seems to be of little moment whether he who maintains the suit of another receives his reward from the subject of the suit, or from any other property of the suitor. Champerty is one species of maintenance, but the authorities do not declare contracts for a part of the thing in demand universally unlawful. The distinction made by the books between interference which is illegal, and that which is lawful, consists in the rule and the exceptions stated, and where maintenance is lawful, as is the case of interest in the subject of the suit, or relation to the suitor, a contract to divide the subject of the suit which is maintenance in a particular form, is also legal."

The foregoing language is quoted by the Judge in the case of Berrian *vs.* McLane, with the remark that these views were ably supported, are not satisfactorily answered in the reasoning, or by the authority of any of the cases which had been cited for the respondent in that case.

What has already been said in regard to some of the views contained in these extracts is sufficient, I apprehend, to exhibit the views we entertain in reference to them : We are now considering the question whether the evils of champerty continue to exist in the present advanced state of society and government in this country. We have considered the reasoning of the counsel in this case, and of counsel and Courts in other cases in favor of the proposition assumed, with profound attention ; but have been forced to the conclusion, that while maintenance can hardly be supposed to exist in some of its ancient forms, and is far less dangerous now in any form than it was in the reign of Edward the First, and some subsequent reigns, yet, champerty is not allowed

by the law of this State, nor by the policy of the general law in this country, and that contracts of this kind between attorney and client, however fair and just they may be in the individual instance, as we have no doubt was the case in regard to the contract between the parties in this suit, are pernicious in their consequences, and therefore forbidden.

That the moral, physical and intellectual condition of the people of that country in which the common law had its origin, has vastly improved, and their social position been elevated by the steady march of civilization and refinement, are truths most gratifying to every lover of his kind. A comparison between the dark and barbarous period of the past which has been referred to, when men could only be governed by force, and the present enlightened state of that country where the principles of freedom have advanced beyond any limits which the learned and wise men of antiquity deemed practicable, or consistent with the stability and safety of government, and especially with that state of perfect freedom in this country, where the principle of self-government is not only declared in theory, but successfully and triumphantly carried out in practice, certainly affords the true philanthropist the most cheering grounds of rejoicing in the present, and of hope and faith that our race is still to pursue an onward and upward course, until man's highest and noblest faculties become so cultivated and developed, that he shall see all apparently conflicting interests harmonize, and all human motions controlled by that golden rule, which teaches him to seek his own good only in doing good to others.

The universal diffusion of the means of knowledge, and that spirit of free inquiry into the grounds of generally received opinions, and the true motives and ends of human action, whether connected with the science of government, with theology or ethics, which sometimes runs into wild extravagance and absurd speculations, will, we may well hope, result in the discovery of new and profitable truths, and the

illustration and enforcement of others already acknowledged, and all tending to that elevation of human character and human society so much desired and hoped for by the wise and good.

But it is the duty alike of those who dictate rules of action, and those who are appointed to enforce obedience to those rules, to see the state of society as it exists under its present organization and in its present state; it is the duty of the legislator to look at the present in connection with the history of the past, and the prospects and promises of the future, in order that the laws may be adapted to that state of progression and advancement which the interests of all demand, and the intelligence of the age indicates to be practicable—it is the duty of those who administer the laws, in order that the true intent of the Legislature may have effect, and that injustice shall not be done by the application of a rule to a case or state of things for which it was never intended. Hence, investigations of this kind are by no means to be discountenanced, but rather encouraged by the judicial tribunals of the country, both as an aid in the administration of justice, and as a means of attracting the attention of the Legislature and the country to any defects in the law which ought to be remedied, or any improvements which may be made.

It is true, that some of the reasons of the law against maintenance and champerty have passed away, and that the law has been modified by exceptions and constructions, in accordance with the altered condition of the social state, and that now they are, comparatively, but little felt as evils. There can now scarcely be a motive in this country for a stranger to aid in the prosecution of a suit, without any chance of pecuniary benefit to himself, unless it be one of charity to an individual, or of public benevolence, in which case the act would be lawful; and for this reason *unlawful* maintenance but very rarely occurs in its simple

Henry T. Backus *vs.* Henry Byron.

form. But champerty presents a strong temptation to engage in it: that of pecuniary profit; one that has a charm which captivates the man of intellect and learning and genius, as well as the more stupid and unlearned, and one which, unfortunately, presents stronger inducements to those of the legal profession than to any others, because they are better qualified to calculate the chances of success, and they can prosecute suits at less actual expense, and, consequently, hazard less in the chances of litigation. Comparatively few of that profession have all the business that they have time to attend to; and if one devotes time which would not otherwise be actually occupied, to the prosecution of a doubtful claim, the client paying the ordinary expenses, and he fails to succeed, he is not the poorer for his exertions; whereas, if he succeeds, he is paid, not only for his services, but for the risk of their loss. He has a strong temptation, too, with the chance of such a bargain before him, to deceive his client, and to represent a title or claim as doubtful, or difficult to be established, when he believes it to be clear and easily established.

These are some of the motives which are presented to the attorney, if such bargains are held to be lawful; and to them may be added, a strong temptation to interest himself with others in searching for cases where, by reason of some oversight in the forms of conveying, or by some mistake, one man has a legal advantage by which he can oppress another, making known such advantage to the person who holds it, and encouraging him to avail himself of it, by the offer of a division of the proceeds, as a compensation for enforcing it.

To other parties it holds out a strong inducement to prosecute doubtful and unjust claims. Many a man with abundant means would not be willing to prosecute a suit, with the chances of having to pay all the costs on both sides, in case of failure, who, if his attorney should offer to take a portion

of that risk for an interest in the chances of success, would no longer hesitate to sue. Instances might be multiplied to show that the legalizing of such contracts would tend to promote useless and unjust litigation, and have a demoralizing influence, both upon the profession and the public.

Attorneys, solicitors and counsellors are sworn officers of the Court, appointed to aid the Courts in which they are employed in the administration of impartial justice, and not only the character with which they are thus invested, but the positive laws of this State, require that they shall not be guilty of any deceit or collusion, nor to consent to any deceit nor collusion, with intent to deceive the Court, or any party, and the statute makes a violation of this duty a misdemeanor, punishable by fine and imprisonment, and subjects the guilty party to a civil action and treble damages, for the injury.

They are not allowed to buy, or be, in any manner, interested in buying, any bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose of bringing any suit thereon, nor can they loan or advance any money, etc., as an inducement to the placing, or in consideration of having placed, in the hands of such attorney, solicitor or counsellor, or in the hands of any other person, any debt, demand, or thing in action, for collection, upon pain of fine and imprisonment, or both, in the discretion of the Court. (*R. S., pp.* 424, 425, §§ 37, 40, 41, 42.)

Can it be less an offence for an attorney to purchase land with the avowed object and purpose of prosecuting a suit for its recovery? If the purchase of a chose in action by an attorney, for the purpose of bringing a suit thereon, is against the policy of the law, what reason can be assigned why it is not equally against its policy to allow him to bargain for an interest in land for the same purpose, and thus become a party in intent with his client in the suit. The duty which an attorney owes to his client, to the Court, and to "any party" to the litigation, would be in conflict with his interest. Besides,

as remarked by Lord Winslow, in the case of Welles *vs.* Middleton, there would be no bounds to the crushing influence of the power over the client, if it were not so.

Attorneys are the persons to whom the clients must apply to prosecute and defend their suits, and to transact much of their important business, and Courts both of law and of equity will guard this confidential relation with jealous care, that no advantage be taken by persons in that relation; and judgments bonds and other securities given by a client to his attorney or solicitor, on account of services rendered, or moneys advanced, will be set aside or allowed to stand only as security for what is justly and fairly due from the client, though not tainted with champerty. (1 *Cox cases*, 112; 9 *J. R.*, 253.) It is said that the doctrine of champerty has never been generally recognized by the Courts of this State, and it has been supposed that the general opinion of the profession has been, that it was not in force here. Upon what authority these assumptions are based, does not appear. Whatever may have been the opinion in some localities, we believe that the general opinion of the profession throughout the State has been otherwise, and we are not aware of any case before the present, in which a Court in this State has held a contrary doctrine. We think it would shock the sense of professional propriety of the members of that profession, should one of their number place upon his sign or business card, an advertisement that he would prosecute lawsuits for a share of the thing in dispute, upon condition that if he did not win, he should receive nothing for his services. It would be universally regarded as an unprofessional act, justly subjecting him to animadversion, as calculated to bring a reproach upon his calling. Yet if such contracts are upheld, such an act ought not be regarded as censurable.

It is proper, in closing this opinion, to say, that in this discussion, while we have endeavored to explain and illustrate a principle, by showing what evil consequences may, and

would naturally result from discarding the doctrine of champerty, we have intended no censure upon the attorney who is plaintiff in this suit. It may have been, and probably was, a mode of payment proposed by the defendant for his own convenience, and fair and just in itself as between the parties, entered into by the attorney without reflecting upon the policy of such contracts in general. Finally, upon principle, as well as authority, we are compelled to hold the agreement declared upon, and established by the proof in this case, void, on the ground of champerty, and to reverse the judgment of the Circuit Court therein.

Present, GREEN, WILLSON, BACON, and JOHNSON, J. J.